## SOUTH CAROLINA & G. R. CO. v. CAROLINA, C. G. & C. RY. CO.

## FARMERS' LOAN & TRUST CO. v. SAME.

### (Circuit Court of Appeals, Fourth Circuit.  March 31, 1899.)

### No. 260.

1. RAILROADS—RECEIVERSHIP—CONTRACT WITH RECEIVER FOR OPERATION OF ROAD.

The receiver of a short line of railroad, the earnings of which were less than the expenses of operation, entered into a contract with a company owning a connecting line by which the latter agreed to operate the road, keeping the accounts thereof in the receiver's name and subject to his inspection. and charging against the road only the actual cost of its operation, including ordinary and necessary repairs. *Held*, that such contract was not one of lease, but one under which the second company operated the road as agent of the receiver.

2. SAME—POWERS OF RECEIVER.

A receiver of a railroad may be authorized by the court to make any contract relating to the road or its operation, during the term of the receivership, which the corporation of which he is receiver had power to make.

3. SAME—RATIFICATION OF PRIOR CONTRACT BY RECEIVER.

A receiver of a railroad, appointed by a state court in a cause in which all parties interested in the property were before the court, with the approval of the court entered into a contract with another company for the operation of the road. Subsequently the cause was removed into a federal court, and there consolidated with another, and in such court the same person was appointed receiver. The operating contract previously made, though terminable on 15 days' notice, was continued by the receiver, and was several times before the court, and recognized by orders made on the petition of the receiver; and no objection was made to its continuance by any of the parties. *Held*, that such action amounted to a ratification or adoption of the contract, which rendered it as valid and binding on the receiver, as an officer of the federal court, as though expressly authorized by that court.

4. SAME—EXPENSES OF OPERATION UNDER RECEIVER—DAMAGES FOR INJURIES.

Damages for personal injuries caused by the negligence of employés are incidental to the operation of every railroad, and may properly be classed as a part of the operating expenses, whether the road is operated by a corporation or a receiver; and the liability for such damages, as between themselves, is a legitimate subject of agreement between the parties to a contract for the operation of a road, who deal with each other on equal terms.

5. SAME—CONTRACT FOR EXEMPTION FROM LIABILITY FOR NEGLIGENCE—POWERS OF RECEIVER.

A receiver of a railroad and a company owning a connecting line entered into a contract by which the company agreed to operate the receiver's road without any direct compensation therefor, beyond the actual expenses of such operation, and which, in effect, constituted it the receiver's agent for the purpose. Under the statutes of the state, a railroad company was authorized to make a contract to run, use, or operate the road of another company on such terms as might be agreed upon. *Held*, that a provision of such contract that the company should not be held responsible in any way for any accident or damages to either persons or property that might occur on the line of such road, in its operation. but should be held harmless and indemnified from any suits or damages by reason thereof, was not ultra vires, either on the part of the company or the receiver, when construed, as it must be, to exclude liabilities arising

from the recklessness or gross carelessness of the company, and to apply only to such as might arise in its operation of the road in good faith, and in the exercise of due care in selecting its employés, from the mere negligence of such employés.

6. SAME—PUBLIC POLICY.

Nor is such contract, as so construed, void, as against public policy, on the ground that it exempts the company from the consequences of its own negligence, where the parties in making it stood on an equality, and it is shown to have been advantageous to the receiver, since, for the mere negligence of any agent whom he might have employed to perform the service, the receiver, and not the agent, would be liable.

Appeal from the Circuit Court of the United States for the District of South Carolina.

The Carolina, Cumberland Gap & Chicago Railroad Company was a corporation formed by the consolidation and merger of various railroad companies chartered by the state of South Carolina with a view to the construction of a railroad from the town of Aiken, in South Carolina, to a point in the valley of the Ohio river; and 24 miles were constructed, extending from the town of Aiken to the town of Edgefield. A mortgage was executed November 1, 1882, to the Farmers' Loan & Trust Company of New York, to secure bonds to the amount of $550,000; and upon the construction of this section, in the year 1888, 550 bonds, each of the value of $1,000, were issued. On May 1, 1890, the road was leased to the receiver of the South Carolina Railway Company, at an annual rental of $18,750, less taxes, for the period of the receivership, which continued until May 15th in the year 1894, when, the South Carolina Railway Company having been sold, the South Carolina & Georgia Railroad Company became its successor. On November 27, 1893, Neil McDonald, claiming to be the holder of a large amount of the first mortgage bonds, commenced proceedings in the court of common pleas for Aiken county, in the state of South Carolina, alleging that coupons of said bonds to the amount of $3,210 were past due and unpaid, that the corporation was insolvent, and that its equipment was totally inadequate to pay its first mortgage bonds, and praying the appointment of a receiver; and on December 1, 1893, Wilbur F. Herbert was appointed by the presiding judge of that court receiver of the company, with the usual powers of receivers, and gave bond, filed an inventory, and took charge of the road. In this proceeding there were no parties except the plaintiff and the defendant company. On April 27, 1894, an order was entered giving plaintiff leave to amend his proceedings by bringing in as defendants T. G. Croft and others, holders of a small amount of bonds and stock, and also giving leave to join as party plaintiff the Farmers' Loan & Trust Company. Leave was also granted to plaintiff to amend his complaint by adding such allegations as might be necessary to obtain a decree of foreclosure. On November 28, 1894, the Farmers' Loan & Trust Company filed a petition in said cause, setting forth that it is one of the plaintiffs in that suit, that it is a nonresident, that the matter in dispute exceeded in amount the sum of $2,000, that the order making it a party plaintiff had only come to its knowledge since the last term of the court, and praying that the cause be removed to the United States circuit court. A removal bond was filed with the petition, but no order of removal was entered. On November 30, 1894, the Farmers' Loan & Trust Company filed a bill in the United States circuit court for the foreclosure of the mortgage; and on the same day Wilbur F. Herbert was appointed receiver, with the usual powers of receivers, and he was directed to take possession, and to operate the road. There was no reference, either in the bill or in the order appointing the receiver, to the proceedings in the state court. On January 17, 1895, an order was entered in the United States circuit court, in a cause entitled "Neil McDonald, Plaintiff, v. The Carolina, Cumberland Gap & Chicago Railway Company and others, Defendants," reciting the consent of all the counsel therein to the removal from the state court, and ordering that the same be removed, and that the cause be consolidated with the suit of the Farmers' Loan & Trust Company. Thenceforth all the orders entered were entitled in both causes. When the South Carolina Railway was sold, and the

receivership terminated, the agreement for the operation of the road from Aiken to Edgefield by said receiver was, by its terms, ended, and a new agreement between the South Carolina & Georgia Railroad Company, its successor, and Wilbur F. Herbert, was entered into, by a correspondence which is as follows:

"June 4th, 1894.

"Mr. W. F. Herbert, Jr., Receiver Carolina, Cumberland Gap & Chicago Railway Co., No. 6 Wall Street, N. Y. City—Dear Sir: Referring to our conversation this morning, I write to make the following proposition for the operation of your railroad, viz.: The old arrangement with the receiver of the South Carolina Railway Company, to pay a fixed rental, to continue until May 15th, 1894. From May 15th, 1894, to July 15th, 1894, the South Carolina and Georgia R. R. Co. to operate the Carolina, Cumberland Gap & Chicago Ry., without making any charge, under the head of general expenses, for the auditing of and keeping of its accounts. The present basis of divisions of earnings between the two roads to remain in force. The South Carolina and Georgia R. R. Co. to turn over to the Carolina, Cumberland Gap & Chicago Railway Co. all net revenue earned by said road, after deducting the actual cost of operation; the said cost of operation to consist of the maintenance of way and the structures for the road, cost of conducting transportation, and the cost of maintaining the machinery and equipment used in its operation. The terms, viz. 'general expenses,' 'maintenance of way and structures,' 'maintenance of equipment,' and 'conducting transportation,' being used as now applied to the distribution of expenses of the South Carolina and Georgia R. R. Co., or as applied by the interstate commerce commission in the distribution of expenses in 1893–94. Settlements of accounts to be made monthly, within thirty days after the close of each month, based on the monthly report of the operation of the road. The proportion of coaches used in running trains between Edgefield and Augusta to be furnished by each company on the basis of mileage. The South Carolina & Georgia R. R. Co. not to be responsible for any taxes or assessments of any character, either state, county, or municipal; nor is it to be responsible for any of the expenses which have been, or may hereafter be, incurred by the receiver of the Carolina, Cumberland Gap and Chicago R. R., or any of its officers, agents, or employés, nor for any of the expenses of the Carolina, Cumberland Gap & Chicago Ry. Co., or its officers, agents, or employés. The South Carolina & Georgia R. R. not to be held responsible to the said Carolina, Cumberland Gap & Chicago Ry. Co., or its receiver, or accountable in any way, for any accident or damages to either persons or property that may occur on the line of the Carolina, Cumberland Gap & Chicago Ry. in its operation, and to be held harmless and be indemnified from any suits, actions, or damages against said South Carolina & Georgia R. R. Co. by reason thereof. This letter (pending negotiations for a more permanent agreement), with your reply confirming the same, to constitute a temporary agreement or contract to July 15th, 1894. Yours, truly,

"[Signed]                        Charles Parsons, President."

"Carolina, Cumberland Gap & Chicago Railway Company.

"Office, 6 Wall Street, New York.

"Wilbur F. Herbert, Jr., Receiver.

"June 5th, 1894.

"Charles Parsons, Esq., Pres. S. C. & G. R. R. Co., No. 96 Broadway, N. Y.—Dear Sir: Your proposition for the operation of this road, dated the 4th inst., is received; and the same is accepted, subject to the approval of the court, and to one or two minor provisions, to wit: That charges for labor, material, and supplies should be made at rates not to exceed those paid by your road; that extraordinary repairs to roadway, bridges, and rolling stock shall not be made until I have been advised thereof; and, lastly, that this company's accounts, as kept by your auditor, shall at all times be open to the inspection of the writer. I would request a statement of earnings and expenses for the month of May at as early a date as possible, and that a statement of the gross earnings be rendered to me weekly thereafter. Yours, truly,

"[Signed]                        Wilbur F. Herbert, Jr., Receiver."

93 F.—35

"Carolina, Cumberland Gap and Chicago Railway Company.
"Office, 6 Wall Street, New York.
"Wilbur F. Herbert, Jr., Receiver.
"July 9th, 1894.

"Mr. W. F. Herbert, Jr., Receiver Carolina, Cumberland Gap & Chicago Ry., No. 6 Wall St., City—Dear Sir: Referring to our conversation of this day, and to agreement with you by this company for the operation of the C., C. G. & C. Ry., as set forth in letter of our president to you under date of June 4th, 1894, and in your letter to our president dated June 5th, '94, I beg to state my understanding of the agreement which we made, which was that the agreement covered by the above-mentioned letters shall continue after July 15th, 1894, subject to termination by written notice made by either party to the other at least fifteen days prior to the termination under such notice; such notice to be made by you in behalf of the C., C. G. & C. Ry. Co., and by either the president of this company or myself in behalf of the S. C. & G. Ry. Co. Will you kindly reply; such reply, with this letter, to constitute the agreement? Yours, truly,            Charles Parsons, Jr., Vice President."

"No. 6 Wall St., Room 127.
"July 11th, 1894.

"Charles Parsons, Jr., Esq., V. P. S. C. & G. Ry. Co., 96 B'way, N. Y.—Dear Sir: Your favor of the 9th inst. is received, and the proposition therein contained for the further continuance of our present agreement concerning the operation of this road is accepted, subject to the approval of the court; your letter, with this reply, to constitute an agreement which may be terminated upon 15 days' notice by either of the parties therein. Yours, truly,
"[Signed]                          Wilbur F. Herbert, Jr., Receiver."

And thereupon the receiver filed his petition in the state court, setting forth the correspondence, and praying that he be allowed to enter into the agreement therein set forth. An order was entered by the judge of that court, August 22, 1894, authorizing him to enter into said agreement, and ratifying and approving his actings and doings under said agreement up to that date. It appears from the report of receiver, filed April 1, 1894, that the gross earnings of the road for the year ending December 31, 1893, were $40,215.84, and the expenses $41,350.20.

On January 4, 1895, shortly after his appointment as receiver in the United States court, Wilbur F. Herbert filed his petition in that court, setting forth his previous appointment in the state court in the suit of Neil McDonald, the agreement with the receiver of the South Carolina Railway Company, and the termination thereof, and that thereafter he had entered into an operating agreement with the South Carolina & Georgia Railway Company, as of date May 1, 1894, a copy of which he annexed to his petition, praying that it be taken as a part thereof. The petition stated that the principal business of his road was the transportation of rock quarried along its line, and that during the past three months that business had decreased to about one-fourth of its usual volume, and greatly reduced the revenue of the road; and a statement was filed exhibiting the gross earnings and operating expenses for the seven months preceding, showing a considerable deficit, and that he needed "for present disbursement the sum of $6,274.27, which included a deficit of $524.27, due the S. C. & Ga. R. R. Co., which is the result of the operation of the defendant road by said S. C. & Ga. R. R. Co. for the four months ending November 30, 1894." The petition stated that one of the trestles over Pace's branch was in an unsafe condition, and set forth the proceedings in the state court wherein the judge of that court had ordered the receiver to obtain estimates and make contracts necessary for its repair and reconstruction; and authority was asked to issue notes to pay for such repairs, and to pay a deficit of $524.27 due the South Carolina & Georgia Railroad Company, which was the result of the operation of the road by said company for the four months ending November 30, 1894. Upon this petition an order was entered in the United States circuit court authorizing the receiver to borrow $7,500 upon his notes for the payment of the work done on Pace's trestle, and other expenses necessary to

be paid by the receiver: said notes to be payable out of the earnings of the road. Subsequently, upon petition of receiver, reporting that the notes in that form could not be negotiated, and after notice to counsel for the trustees, an order was entered allowing the notes to be issued, and to be first liens upon the road; the trustee filing an answer submitting the matter to the discretion of the court, and stating that it had no suggestions in opposition. The form of certificate, which stated that the money was borrowed for the payment of repairs on the Pace's trestle, and other expenses necessary to be paid for by the receiver, as set forth in his petition, was approved by the circuit judge May 23, 1895. On August 31, 1895, a petition was filed by the receiver stating that the roadbed was in such condition that further operation would be dangerous to life, limb, and property, unless several thousand new cross-ties were laid to replace those that were old and decayed. With this petition were filed the affidavits of the general superintendent and road master of the South Carolina & Georgia Railroad Company, which company, as therein stated, was "operating the Carolina, Cumberland Gap & Chicago Railroad for the receiver of said road," and thereupon an order was entered allowing the receiver to purchase 7,000 cross-ties. On September 6, 1895, the receiver filed a petition stating that on June 25, 1895, an engine was wrecked upon the line of the defendant road by means of a spike driven between two rail joints by some person unknown, whereby the engineer, Parker, and fireman, Cherry, were badly injured, and asked leave of the court to compromise, for an inconsiderable sum, which had been agreed upon, the claims of said engineer and fireman, which, as stated in the petition, would "relieve said defendant road and the receiver from any further claim for damages by reason of said accident"; and an order was entered allowing the receiver to make the compromise, which order was on September 17th, vacated. On October 26, 1895, the South Carolina & Georgia Railroad Company filed a petition reciting the terms of the operating agreement, claiming that it was entitled to be indemnified against any suits, actions, or damages, and asking that provision for its proper protection be made in the decree of sale; the petition setting forth in detail the nature of the claims and suits against it growing out of the operation of the road. A decree for sale was entered September 7, 1895, and on October 30th the master commissioner reported the sale of the road to John D. Reynolds, for and on behalf of a committee of bondholders, for the sum of $67,000; and to the report of sale was attached a copy of a notice given on the day of sale by the general manager of the South Carolina & Georgia Railroad Company, that that company had claims against the receiver for the amount of about $5,000, and had also claims for reclamation, if his company should be held responsible for certain damage claims then pending. On January 16, 1896, the circuit judge, passing upon a motion for a distribution of a part of the proceeds of sale among the counsel in the cause, which was resisted by counsel for the South Carolina & Georgia Railroad until the suits then pending against it were determined, held that these actions, being based solely upon the negligence of the petitioner, its servants and agents, any contract with the receiver intended to indemnify it against its own negligence would be void on the ground of public policy, and therefore there was no sufficient reason to withhold the distribution of the fund until the pending suits were decided. He accordingly ordered the payment of $5,000 to counsel for the trustees, and $3,950 to other counsel in the cause; and with respect to so much of the petition as claimed that, by the terms of the operating agreement, the expense of operating the road over and above the income thereof was to be borne by the receiver, this decree provides as follows: "The amount due to the South Carolina & Georgia Railroad Company on its contract for operating the road must be paid. Let that account be adjusted, and when so adjusted be paid." On January 18th the circuit judge ordered that so much of the opinion as adjudged the contract to be void on the ground of public policy be modified, and granted leave to the petitioner to make the question as to its right of indemnity under the contract made with the receiver, and ordered that the funds be held by the special master subject to the decision of that question. On April 13, 1896, the deed for the road was executed by the master to the purchaser upon a condition that the conveyance should be subject to the payment of any claims against the proceeds which might be legally estab-

lished, to the extent of $42,000, the balance of the purchase money unpaid; and the purchaser subsequently organized the Carolina & Cumberland Gap Railway Company, which is the respondent in this case. On June 3, 1897, the South Carolina & Georgia Railroad Company filed its petition in accordance with the order of January 18, 1896, stating that three suits growing out of the accident on June 25, 1895, had been prosecuted against it, and although they were defended by counsel of the highest standing, and by counsel selected by the receiver, verdicts to the amount of $9,500 had been recovered against it in the court of common pleas for Edgefield county, which had been affirmed by the supreme court, and that certain other claims, of which a detailed statement was given, had not yet been adjusted. A committee of bondholders, upon their petition filed, were allowed to intervene and contest this claim. On June 3, 1897, counsel for the Carolina & Cumberland Gap Railway Company gave notice of a motion to dismiss this petition, and, after the hearing thereof, a decree was entered dismissing the same; and the appeal from this decree brings the cause here.

Joseph W. Barnwell and William B. Hornblower, for appellant.
Augustine T. Smythe, for appellee.

Before GOFF, Circuit Judge, and MORRIS and BRAWLEY, District Judges.

BRAWLEY, District Judge (after stating the facts as above). The parties interested in this controversy are certain holders of the first mortgage bonds of the Carolina, Cumberland Gap & Chicago Railroad Company and the South Carolina & Georgia Railroad Company, which will hereinafter be designated as the appellant. These two companies were entirely independent of each other,—each free to manage its own affairs, and neither owing any duty to the other, except such as the law prescribed with respect to interchange of business. Those duties to the public, which the law imposes upon all railroad corporations, could not be invoked by one as against the other; and, while the statute permitted one to lease the other, it did not impose it as a duty. In entering into an agreement, each party was free to consult its own interest or inclination. The receiver of the one, and the president of the other, were men of sufficient intelligence to understand the condition and interest of their respective roads. As to the receiver, the record contains evidence of his standing among men of business; for in March, 1894, when Croft and others made an effort to remove him, 10 or 12 citizens of New York, some of whom are readily recognized as men of substance, holders of 492 of the 550 first mortgage bonds, united in a petition, sworn to by each of them, in which they state their belief that Herbert was "fully competent to act as receiver, and that he could fully protect the interest of all in any way interested in the railway company, and that any change would be prejudicial to all concerned." Among these bondholders will be found the names of the members of the committee which intervened to contest this claim; and the same bondholders, when the motion for the removal of the receiver was renewed before Judge Simonton in March, 1895, again united in the request for his retention. In November of the same year, long after this agreement had been made, and while the road was being operated under it, the counsel for the trustee moved and secured his appointment as receiver in the United States court. That he had the confidence of the court appears from the fact that all

of his recommendations seemed to have met its approval, and nothing appears to impeach his character or capability. We have, then, as one of the parties to this contract, a person whom nine-tenths of the bondholders, the trustee, and the judges of the state court and of the United States court have selected as a fit and proper person to manage this road. When the contract with the receiver of the South Carolina Railway Company terminated, he had either to operate the road himself, or to have it operated by another, or to stop operations altogether. With its meager rolling stock and beggarly receipts, which in the year preceding the making of this contract were insufficient to pay operating expenses, it cannot be imputed to him as a fault that he did not undertake to operate the road himself; and, if it were to be kept as a going concern, he must, of necessity, make some operating agreement, either with the Southern Railway, which crossed it at Trenton, or with the South Carolina & Georgia Railroad Company, with which it connected at Aiken. As it appears from the petition of the receiver, filed January 4, 1895, the principal business of the road was the transportation of rock from a quarry on its line. This rock was used in building the jetties in Charleston. Naturally, therefore, the last-named company was the most likely to make a favorable arrangement with him. He had, it appears, made a satisfactory agreement with Mr. Chamberlain, the receiver of the South Carolina Railway Company. It is beyond our province now to go into that agreement. Whether Mr. Chamberlain made it with the expectation of so far encouraging the owners of the property as to lead them to extend their road, or whether its business at the time was better than it subsequently became, or whether it was simply an improvident contract on his part, it is not for us to determine. It is sufficient to say that Mr. Parsons was unwilling to enter into any such arrangement when he became the president of the new company, and in view of the earnings of the year before, as shown in the record, it is hardly to be conceived that any sensible business man, having due regard to the interests of his own company, would pay any such sum for the privilege of operating this road. That he had some interest in keeping the road going is obvious, for his road derived a certain amount of business from it, and this doubtless was the consideration that moved him. The contract was not made in haste, but apparently with due deliberation. The receiver had the benefit of the advice of counsel, for it appears from the itemized statement of the account of receiver's counsel in New York, contained in the record, that this agreement was the subject of long and frequent consultations between the receiver and his counsel. As this account was submitted to the circuit judge, and compensation was allowed for it, it is to be presumed that the judge considered the advice to be worth something.

The order of Judge Aldrich appointing Herbert receiver, December 1, 1893, provides as follows:

"Said receiver is hereby authorized and empowered to maintain and operate said railroad, and hold, preserve, and care for said property and assets, with power to do all such acts and make such contracts as are necessary or proper

to enable him to fully carry out and discharge the purposes of this appointment; and the said Wilbur F. Herbert, as such receiver, shall succeed to all the rights and assets of said Carolina, Cumberland Gap & Chicago Railway Company."

And, after providing for his giving a bond and appointing a local attorney, it adds that he may apply to the court or judge thereof from time to time for such instructions and orders as may be deemed necessary.

In the nature of things, a receiver cannot, in person, perform the manifold duties required in the operation of a railroad. Engineers, firemen, conductors, trainmen, trackmen, a general manager or superintendent to supervise, and accountants to keep the accounts, are all necessary. In other words, he must have agents to do the physical work demanded in its operation; and whether he selects these various employés himself, or chooses a general agent who is charged with the duty, he himself keeping a general supervision over the whole, and reserving the right to terminate such general agency whenever dissatisfied with the conduct of the business, is a question of detail, resting in his sound discretion, subject always to the discretion and control of the court which appoints him. It is an elementary principle that an agent who exercises ordinary diligence and reasonable skill in conducting the business intrusted to him, conformably to the usages and customs applicable to the particular business for which he is engaged, is entitled to be reimbursed all expenses and advances properly incurred; and, unless guilty of fraud or misconduct or gross negligence, he will be reimbursed for all losses that are the immediate results of his employment. A request to undertake an agency or employment operates as an implied request on the part of the principal, not only to incur the expenditures necessary to its proper performance, but also as an implied promise to indemnify the agent for any losses or damages directly incurred in the proper discharge of the duties for which he is employed. Looking at the correspondence between Mr. Parsons and Mr. Herbert, it seems to be nothing more than what on its face it purports to be,—an agreement whereby the South Carolina & Georgia Railroad Company undertook, upon the terms therein stated, "to operate the Carolina, Cumberland Gap & Chicago Railroad Company." It is clearly not a lease, and the obligations growing out of that relation commonly implied by law, and which are binding unless expressly stipulated against, have no application. The record shows that the accounts were kept in the name of the receiver, and all the net revenue earned by the road was to be turned over to him, after deducting the actual cost of operation. No extraordinary repairs to roadway, bridges, or rolling stock were to be made until he was advised thereof; and charges for labor, material, and supplies were to be made at rates not exceeding those paid by the South Carolina & Georgia Railroad Company. The accounts were to be at all times open to his inspection, a statement of the gross earnings was to be rendered to him weekly, settlements were to be made monthly, and the agreement was terminable by either party upon 15 days' notice.

The particular clause which has given rise·to this litigation is as follows:

"The South Carolina and Georgia R. R. not to be held responsible to the said Carolina, Cumberland Gap and Chicago Ry. Co., or its receiver, or accountable in any way, for any accident or damages to either persons or property that may occur on the line of the Carolina, Cumberland Gap and Chicago Ry. in its operation, and to be held harmless and be indemnified from any suits, actions, or damages against said South Carolina and Georgia R. R. Co. by reason thereof."

While it may be that, if this agreement had been drawn by lawyers, its different terms and conditions might have been expressed more artificially, it would be difficult to make plainer the true intent and meaning of it as it was understood by the plain men of business who entered into it. Every word chosen has a well-understood meaning among railroad men, and the obvious meaning of plain terms cannot be rejected because ingenious reasoning may give to them an interpretation involving consequences at which the legal mind may affect to be shocked. That Mr. Parsons, whom the learned judge below characterizes as a man of great ability and experience in railroad management, would enter into any agreement whereby all the profits were to go to another, and all the losses and risks were to fall upon him, is incredible. Every one at all acquainted with railroad management knows that accidents will happen, and that nearly every so-called accident can be traced back to some carelessness, some neglect, some inattention; that the most careful of men will sometimes slip, the most vigilant will sometimes sleep. Damages arising from negligence are so much the usual incident of railroad operation, that they are classed as operating expenses, and it is not to be believed that any one who undertook to make an agreement to operate a railroad should fail to take them into account. When, therefore, Mr. Parsons stipulated that he was not to be held responsible or "accountable in any way for any accidents or damages to either persons or property," and that he was to be "held harmless and be indemnified from any such suits, actions, or damages against the said South Carolina and Georgia Railroad Company by reason thereof," he must have had in mind such suits and damages as are the ordinary incidents of railroad management. Suits for damages to persons are always predicated upon negligence, and, if he did not intend to be indemnified against them, the words used would be meaningless and without effect. That Receiver Herbert so understood the agreement is equally plain; for, when the accident which gave rise to these claims occurred, he applied to the court for leave to settle them, which the court wisely ordered, but which order the counsel for trustees most unwisely caused to be vacated, and, when the suits were brought in the state court, the counsel for the receiver appeared and took part in the defense. If we bear in mind what was the real condition of this road at the time the agreement was made, we can well understand why it was made, and any suspicion that it was of such an improper and improvident character that it ought not to have been made will disappear. The accounts show that for the year ending December 31, 1893, when it was under lease to the receiver of the South Carolina

Railway Company, the gross earnings were less than the operating expenses. That the road was operated more economically by this receiver than it could possibly have been if operated independently, seems certain. So, when that agreement terminated, the receiver, Herbert, had on his hands a road that could not pay expenses. If he had undertaken to operate the road himself, there can be no doubt that any deficit in its operation would have been allowed by the court, and any damages recovered against him on account of the negligence of his servants would have been treated as operating expenses. As was said by the court in Cowdrey v. Railroad Co., 93 U. S. 352:

"The allowance for goods lost in transportation and for damages done to property whilst the road was in the hands of a receiver was properly made. The earnings received were as much chargeable with such loss and damage as they were chargeable with the ordinary expenses of managing the road. The bondholders were only entitled to what remained after charges of this kind, as well as the expenses incurred in their behalf, were paid."

And in the later case of Barton v. Barbour, 104 U. S. 131, the court, after citing the above, says:

"The claim of the plaintiff, which is against the receiver for a personal injury sustained by her while traveling on the railroad managed by him, stands on precisely the same footing as any of the expenses incurred in the execution of the trust and must be adjusted and satisfied in the same way."

Claims against the receiver in his capacity as a common carrier are on the same footing, precisely, as the salaries of his subordinates, or as claims for labor and material used in carrying on the business. If the South Carolina & Georgia Railroad Company was conducting the road for the receiver, it would seem that such claims would stand upon precisely the same footing as if he was operating it by other agents or servants; and was not that the true relation of the parties? He was to receive all the net income that was earned. The accounts were at all times open to his inspection. Statements of the earnings were to be furnished to him weekly, and settlements were to be made monthly. He was allowed by Judge Simonton's order of January 17, 1895, to issue certificates and to borrow money for the repairs of the trestle on Pace's branch, and to pay other expenses necessary to be paid by him, which included the deficit of $524.27 due the South Carolina & Georgia Railroad Company for the four months ending November 30, 1894, as set forth in his petition upon which the order was predicated. He was also allowed, by order of August 31, 1895, to purchase cross-ties for the road. An order of September 6, 1895, made upon motion of his counsel and upon his petition, authorized him to compromise the claims which are in part the subject of the present controversy, and he had the right at any time to terminate the operating agreement upon 15 days' notice. These various petitions show that the receiver was keeping a proper supervision over the operations of the road, and the petition, in respect to the cross-ties, shows that he regarded himself as in a measure responsible for its safe operation. The fact that he did not seek to terminate the operating agreement, and that the notice of the termination came from the other party some time after the accident which is now imputed to the negligence of the appellant, leads to the infer-

ence that he had no reason to complain of the manner in which it was operated by the party charged by him with that duty.

The next question is, was this agreement one which the Carolina, Cumberland Gap & Chicago Railroad Company could lawfully make? The general rule is that a corporation possesses only such powers as are conferred by its charter, with such incidental powers as may be necessary to carry into effect those expressly granted. The general powers of this company were to construct, maintain, and operate a railroad, and no special provisions of its charter bearing upon the point have been cited; but, under the general railroad law of South Carolina (section 1624, 1 Rev. St. 1893), all railroad companies created by or existing under the laws of that state were empowered "to enter into contracts for the purchase, use or lease of other railroads upon such terms as may be agreed upon with the companies owning the same, and may run, use and operate such road or roads in accordance with such contracts or lease," provided that the roads so contracting are connected with each other. By the same general law (page 544, Id.), when a railroad is lawfully maintained and operated by trustees or receivers, they are subject to the duties, liabilities, restrictions, and other provisions attaching to the corporation for whose creditors they are trustees or receivers. These provisions of the general law plainly authorize one railroad company to make contracts for the lease or use of other railroads, and it may be considered as settled law that a receiver may be authorized by the court to do any act which the corporation of which he is receiver had the power to do. A receiver represents the court which appoints him, and the corporation itself, which, by the order appointing him, is devested of its rights, privileges, and franchises, all of which are for the time being vested in the receiver. If this agreement was one which the corporation could lawfully make, the receiver could likewise make it. He could not make any contract binding upon the corpus beyond the term of his appointment. And there are certain other limitations upon the powers of a receiver, that need not be discussed at this stage; nor will it be necessary now to determine precisely the measure of a receiver's powers to make contracts relating to the operation of the road in his hands without obtaining the approval of the court appointing him. As he is selected by the court from a presumed fitness, he is generally clothed with a large measure of discretion as to the details of the operation.

We have already stated our views as to the nature of the agreement in question, and will now state our conclusions upon the next point to be determined: Was it authorized by the court, and is it binding upon the parties to the controversy?

That the order of Judge Aldrich was regularly entered and valid, and binding upon all the parties then before the court, unless appealed from, cannot be denied. That court had had jurisdiction and possession of the res since December 1, 1893, when it appointed Herbert receiver in the suit of McDonald, in which the only parties were the plaintiff and the corporation. A petition subscribed and sworn to on March 28, 1894, by holders of about nine-tenths of the first mortgage bonds, was filed in that cause, praying the retention of the said

receiver. On April 27, 1894, an order was entered granting leave to join as party plaintiff the trustee of the bonds. On November 28, 1894, the trustee filed a petition in the cause, entitling it "Neil McDonald and the Farmers' Loan & Trust Company, Plaintiffs, against the Carolina, Cumberland Gap and Chicago Railroad Company, T. G. Croft, and others, Defendants," in which it states that "it is one of the plaintiffs in the above-entitled suit," praying a removal of the cause to the United States court, and filing at the same time a removal bond; but no order of removal was then taken. When the trustee thus became a party to the McDonald suit, the jurisdiction of the state court over all essential parties was complete; and there can be no doubt that the trustee was then in a position to appeal from Judge Aldrich's order, if it had been so advised. If the cause had not been subsequently removed to the United States court, this order would have been binding until reversed; and it is at least doubtful whether it can be impeached collaterally in another jurisdiction, but it is not doubtful that it was binding upon all the parties in the state court when the cause was removed. The removal of the cause to the United States court was somewhat anomalous, but it is not necessary to discuss the regularity of this proceeding. Judge Simonton's order of January 17, 1895, recited that, by consent of all the counsel, "the cause is removed" to the United States court, and consolidated with the suit of the Farmers' Loan & Trust Company, and thereafter all the orders are entitled as in both causes; and the record contains numerous illustrations of the fact that Judge Simonton regarded the orders in the state court as valid and binding. Among them may be cited the orders providing for the payment of counsel employed in that cause, and for the carrying out of the contracts for the purchase of cross-ties made in pursuance of orders there. In no respect, save as to the subject-matter of this controversy, is there anything in the record to show that the proceedings in the state court were regarded as a nullity; but, on the contrary, everything indicates that the United States court regarded the cause as regularly removed, and the proceedings therein as regular and binding. The petition of the receiver, filed January 4, 1895, wherein he asked leave to borrow money, informed the court of the existence of the operating agreement, and the correspondence with appellant was annexed to, and made part of, the petition; and some of the money to be borrowed was for the purpose of paying the indebtedness incurred under that agreement. Judge Simonton's orders of January 17, 1895, and January 22, 1895, allowed the receiver to borrow the money for the purposes set forth in the petition. The court and all the parties to the cause were then fully and formally advised of the existence of this agreement between the receiver and the appellant. The parties took no steps looking to its disaffirmance, and the court recognized its validity in so far as it authorized its receiver to borrow money, a part of which was to be used in the discharge of obligations incurred under it. There was no formal confirmation of this agreement, but we do not apprehend that that was necessary. Contracts made by a receiver of an insolvent corporation do not necessarily end with his resignation or dismissal. His successor may, in certain cases, disaffirm them, and a

reasonable time may be allowed him for that purpose; but, if he does not seek their disaffirmance, they bind him as they did his predecessor. They are not personal, but representative. So, when Herbert the receiver in the United States court succeeded Herbert the receiver in the state court, he could, within a reasonable time, have moved for a rescission or modification of the agreements of his predecessor. If he did not do so, he would be bound by them. He had had more than six months to observe the operations of his road under this agreement, and, although the result showed a deficit, the accounts and affidavits filed sufficiently accounted for the deficit, for they showed that the principal business of his road (the hauling of rock) had decreased to about a fourth of its former volume, and that the dangerous condition of the trestle at Pace's creek had necessitated the transportation of his freight over another road; and he asked leave of the court to borrow money to repair this trestle and to pay the deficit thus caused, and the court, with full knowledge of the condition of the road and of the existence of this agreement by which its receiver was operating its road, granted his petition. It would be difficult to have a more complete ratification by acts than this record discloses. The appellant here was not a party to that suit. He could not be heard in it. He was operating this receiver's road under an agreement which had received the formal approval of one court, which, after six months' experience, had been brought to the attention of another, with no sign of disapproval or dissatisfaction from the receiver, the trustee, the bondholders, or the courts; and, under these circumstances, he had the right to assume that, so long as he performed his part in good faith, the other party would be bound to perform its part; and, as this agreement was terminable on 15 days' notice, he could not be expected or required to appear in a court where he was not a party, and seek a formal ratification. It is fair to assume that all the parties interested were at that time satisfied that this operating agreement was the best method of securing the continued operation of the road.

The facts in Vault Co. v. McNulta, 153 U. S. 554, 14 Sup. Ct. 915, are very different from those here. In that case a receiver had taken a lease for a term of years of some rooms for general offices, paying rental monthly. His successor continued to pay the stipulated monthly rent until the road was sold, up to which date the rent was fully paid. The monthly reports of the respective receivers showed the payment of rent, but did not disclose the terms of the lease, which had never received the approval of the court. The petition asked for the payment of the rent during the whole term of the lease, which extended beyond the period of the receivership, which petition was dismissed upon the ground that a receiver could not make a contract extending beyond his receivership, without the approval of the court; that the mere approval by the court of the master's accounts, wherein the monthly payments of rent were allowed, could not be held to be a confirmation of the lease, because there was no knowledge on the part of the court that such a lease had been entered into by its receiver. The rent had been fully paid for the time when the premises were occupied for the benefit of the trust. Many of the cases cited before

us are referred to in that case, and it is unnecessary to cumber this opinion by reviewing them. They do not conflict with the general principles upon which our judgment rests. All that was decided was that a receiver cannot bind the trust property by a contract extending beyond his receivership, without the approval of the court. There is no contention in the case before us that he has such power. As to the general powers of the receiver in the operation of the road, the court says (page 561, 153 U. S., and page 918, 14 Sup. Ct.):

"It is undoubtedly true that a receiver, without the previous sanction of the court, manifested by special orders, may incur ordinary expenses or liability for supplies, material, or labor needed in the daily administration of railroad property committed to his care as an officer of the court."

We cannot leave out of view for a moment that a railroad is a peculiar kind of property; that it is a matter, not only of public concern, but of private interest, that it should be kept going; that its franchises are liable to forfeiture if it stops running; that its property is specially liable to deterioration and decay; and that its business may be irrecoverably lost. Purchasers of its bonds take them with the knowledge of that infirmity; and when they ask a court to manage their property, and its receivers, in good faith and fair judgment, incur obligations for the ordinary expenses of its management and maintenance, courts of equity would be reluctant to sanction any repudiation of those obligations, even if incurred without their express authority.

It is claimed by the appellee that this agreement is ultra vires, in so far as it relates to the clause of indemnity. Counsel for the appellant, in their argument as to the proper interpretation of this clause, likened it to a contract for casualty insurance, which common carriers, in their dealings with each other, were not forbidden to make, to which appellee replies that any contract of insurance by a railroad corporation is ultra vires and void. It requires no weight of authority to illustrate the obvious and to demonstrate the evident. That a railroad corporation cannot engage in the insurance business is plain. That it cannot, unless the power is expressly given by its charter, enter into a contract of suretyship or guaranty, even if it result in gain or benefit to the corporation, is equally true, if it be beyond the scope of the business authorized by its charter. But we do not accept appellant's interpretation of this agreement as being "a contract of casualty insurance." The agreement, as we conceive it, was within the corporate power of both the railroad companies. Under the general railroad law of South Carolina, any railroad company was authorized to make a contract to run, use, or operate another road "upon such terms as may be agreed upon"; and the stipulation for indemnity is simply one of the terms upon which the appellant company agreed to run and operate the other road. It was a mere question of detail as to which company should pay the operating expenses, and whether, in the adjustment of the mutual accounts, one should refund to the other any sums that it may have been compelled to pay by reason of "any suits, actions, or

damages." Similar provisions will doubtless be found in every contract whereby one railroad company undertakes to lease or operate another. Suits, actions, or damages are incidental to the operation of every railroad, and provision must always be made whereby one or the other of the contracting corporations assumes such burdens. The cases cited in the brief of the appellee were upon facts easily distinguishable from those now being considered. Davis v. Railroad Co., 131 Mass. 261, was upon a guaranty to contribute towards any deficiency that might arise in defraying the expenses of a jubilee and musical festival. Louisville, N. A. & C. R. Co. v. Ohio Val. Improvement & Contract Co., 69 Fed. 431, was upon a guaranty, by a board of directors, of bonds of another railroad company, which, under the statute of Indiana, could be made only by stockholders. Seligman v. Bank, Fed. Cas. No. 12,642, was upon a guaranty by the bank of certain drafts, which was held to be beyond the corporate power of the bank. Trust Co. v. Boynton, 19 C. C. A. 118, 71 Fed. 797, was upon the right of the corporation to lend its bonds, to be used as collateral to secure the individual debts of parties with whom it was dealing. Humboldt Min. Co. v. American Manufacturing Mining & Milling Co., 10 C. C. A. 415, 62 Fed. 356, was upon a guaranty by defendant company that the Variety Iron Company would perform its contract with the plaintiff company. Pacific Postal Telegraph Cable Co. v. W. U. Tel. Co., 50 Fed. 493, was upon a contract whereby a railroad company undertook to give one telegraph company the exclusive right to construct a telegraph line upon its right of way. Pennsylvania R. Co. v. St. Louis, A. & T. R. Co., 118 U. S. 308, 6 Sup. Ct. 1094, decided that unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or other contract, turn over to another company, for a long period of time, its road, and the use of its franchises and the exercise of its powers. In that case the Illinois company had sufficient authority, but the Indiana company had not; hence the contract was held void as to it. In Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 54, 11 Sup. Ct. 478, a contract for 99 years was held unlawful and void, because it was beyond the powers conferred on the plaintiff by the legislature, was in unreasonable restraint of trade, and because it involved an abandonment by plaintiff of its duty to the public. Navigation Co. v. Hooper, 160 U. S. 515, 16 Sup. Ct. 379, held that it was within the chartered power of a railroad company, in the absence of legislative prohibition, to lease and maintain a summer hotel at its seaside terminus, and where the lessee had contracted to keep it insured, and failed to do so, it was liable to the lessor for its value when destroyed by fire during the term. In this case the court approves the language of Lord Chancellor Selborne in Attorney General v. Great Eastern Ry. Co., 5 App. Cas. 473, where, in declaring the importance of the doctrine of ultra vires, he said:

"This doctrine ought to be reasonably, and not unreasonably, understood and applied; and whatever may fairly be regarded as incidental to or conse-

quential upon those things which the legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be ultra vires."

Mr. Justice Gray, who delivered the opinion in Central Transp. Co. v. Pullman's Palace-Car Co., says (page 60, 139 U. S., and page 488, 11 Sup. Ct.):

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as it could be done consistently with adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back, or compensation to be made for it."

We are of opinion that the defense of ultra vires is not sustained by principle, or by the authorities cited in support of it.

The following cases: Woodruff v. Railway Co., 93 N. Y. 609; Vanderbilt v. Railroad Co., 43 N. J. Eq. 669, 12 Atl. 188; Trust Co. v. Cooper, 162 U. S. 544, 16 Sup. Ct. 879,—go far to sustain the proposition that, when a contract has been fully performed in good faith, and the corporation has had the full benefit of its performance, even if it might appear improvident and unreasonable, in the absence of fraud or collusion the corporation could not avail itself of the defense of ultra vires.

The next objection is that this agreement, in so far as it is claimed that it indemnifies the appellant for damages arising from his own negligence, is void, as being against public policy. This is generally the last defense of desperate causes, but in this instance it has an air of reasonableness that entitles it to respectful consideration. Contracts that have in them some taint of immorality, or that tend to restrain competition or trade, or contravene any established interest of society, are held to be void; but, as there is no precise definition of "public policy," each case must be adjudged according to its peculiar circumstances, and courts can only justly exercise this delicate and undefined power in cases free 'from doubt. The only ground upon which this agreement can be held to contravene public policy is that it tended to cause the appellant to omit that care and duty which every railroad company owes to the public. In many of the states, railroad corporations are forbidden by statute to make any contract which exempts them from liability for negligence. The leading case on this subject in the federal courts is Railroad Co. v. Lockwood, 17 Wall. 359, where Justice Bradley states the reason for the rule, which is that a common carrier, in the carrying of passengers and freight, is performing a public duty; that the policy of the law demands that all of his dealings with the public should be reasonable, and, as the customer is largely in the power of the carrier, the latter cannot exact terms which would tend to relieve him of his duty to be careful. The following are extracts from this opinion.

"The carrier and his customer do not stand on a footing of equality. The latter is one individual of a million. He cannot afford to higgle or stand out,

and seek redress in the courts. His business will not admit such a course. He prefers rather to accept any bill of lading, or sign any paper, the carrier presents,—often, indeed, without knowing what one or the other contains. In most cases he has no alternative but to do this or abandon his business."

Again:

"If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment, then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair and no concern of the public."

Again:

"Contracts of common carriers, like those of persons occupying a fiduciary character, giving them a position in which they can take undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness."

In the case of Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, Mr. Justice Gray thus sums up the doctrine of Lockwood's Case:

"This analysis of the opinion in Railroad Co. v. Lockwood shows that it affirms and rests upon the doctrine that an express stipulation by any common carrier for hire, in a contract of carriage, that he shall be exempt from liability for losses caused by the negligence of himself and of his servants, is unreasonable and contrary to public policy, and consequently void."

It will be observed that the contract referred to by Judge Gray is not any contract by a common carrier, but "a contract of carriage." In Hartford Fire Ins. Co. v. Chicago, M. & St. P. Ry. Co., 17 C. C. A. 62, 70 Fed. 202, where a railroad company leased a part of its right of way upon a condition that the company should not be liable for any damage to buildings situated thereon resulting from the negligence of its officers or agents, or from fire communicated from its locomotives, Judge Sanborn distinguishes the class of cases wherein, owing to the inequality of the situation of the parties, which would, if permitted, enable the railroad company to obtain unfair contracts from passengers and shippers, and the fact that contracts with them which exempt the company from liability for negligence relieve it from an absolute duty imposed by law, thus increasing the danger to lives and property of the people from the operation of the railroad, and that class of cases where no duty to lease is imposed, where the companies have an option to lease or refuse to lease. In the latter class, he says:

"The condition excepting the company from liability for damages to the property of the lessees caused by fire set by the negligence of the company relieved the company from no duty it was required by law to perform, but simply provided that it should not assume the additional burden which it had the option to take or refuse."

A railroad company does not assume, by such a contract, to relieve itself of any of its essential duties as a common carrier. He cites the case of Railroad Co. v. Lockwood, and shows clearly that the reason upon which it rests has no application in cases where

the parties are upon the same plane, and free to contract with each other, and says:

"The burden is on the party who seeks to put a restraint upon the freedom of contracts to make it plainly and obviously clear that the contract is against public policy."

Stephens v. Southern Pac. Co., 109 Cal. 86, 41 Pac. 783, is a similar case, wherein the court, in discussing the agreement that such exemption from liability has a tendency to lessen the amount of care the defendants would exercise in preventing fire, and that one who is protected by an agreement against the results of his carelessness will not take the same care as he otherwise would, says that, while this line of reasoning is ingenious, it is not sound law:

"If the doctrine enunciated by respondent be sound, then a multitude of contracts, covering many and diverse subjects, and which are being entered into every day of the world, and recognized and acted upon both by parties and courts, must fall to the ground."

Among such are the ordinary contracts of fire insurance, which have a tendency to lessen the care which the owner would otherwise exercise in the protection of his property from fire.

Contracts which common carriers make with insurance companies, whereby property under their control and in transit is protected, undoubtedly would seem to have such a tendency to lessen the care which is ordinarily demanded of common carriers in the transportation of goods; yet such contracts are sustained by the courts. A very well considered case of this class is that of Casualty Ins. Co.'s Case, 82 Md. 535, 34 Atl. 778, wherein McSherry, J., discusses the whole subject with great ability:

"But they are all, it is alleged, repugnant to public policy, because, by furnishing the carrier with a fund with which to reimburse himself for losses caused by his own negligence, their inevitable tendency or effect is to induce less vigilance or to promote greater carelessness on the part of the carrier."

He shows that precisely the same reasoning would invalidate every species of fire and marine insurance; that, because there may be temptation to negligence, such insurance does not necessarily beget negligence; that it cannot be assumed as a postulate that a carrier, solely in consequence of having such indemnity, will necessarily disregard his duty to exercise care.

That a railroad company may by insurance indemnify itself against loss or injury to property intrusted to its care, even when the loss or injury is caused by its negligence, is settled in this court by Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 324, 6 Sup. Ct. 750, 1176, and California Ins. Co. v. Union Compress Co., 133 U. S. 387, 10 Sup. Ct. 365. It is well-settled law, too, that a carrier may require a shipper, who has insured his goods in transit, to give him the benefit of his insurance. In all of this class of cases the carrier is protected against ultimate liability. So it is not enough to avoid a carrier's contract, as in contravention of public policy, to show that, because he is protected from loss, he may be tempted to violate his duty to the public.

The cases cited by appellee in support of his contention are, in the main, those where common carriers have endeavored to relieve themselves by special contract against their common-law liability. We have already referred to Lockwood's Case. Voight's Case, 79 Fed. 561, simply decided that the railroad company was not relieved of its liability for injury to the messenger of an express company, by a contract between the railroad and the express company. In Stevens' Case, 95 U. S. 655, it was held that the railroad company could not contract against its negligence, and the owner of a car company traveling on a pass was entitled to recover for injuries. It is not claimed that the appellant here is protected against its common-law liability to the public as a common carrier; and it does not seem necessary to review all the cases that fall within the rule in Lockwood's Case, from which this is so readily distinguishable. Contracts in derogation of the common-law responsibility of carriers must not only be plain, so that the unwary public may not be imposed upon, but must also be reasonable, because the carrier and his customer do not stand upon the same footing. They should therefore be construed strictly, and all ambiguities resolved against the carrier; but the reason for the rule ceases when the carriers deal with each other, each having equal opportunities of choosing the language in which to express their agreements, and neither being required to enter into any contract at all. The rights of the public in its relation to common carriers, and the reciprocal obligations flowing from that relation, have no place in this discussion; and this agreement should be construed as if it were between two individuals standing on the same plane, and the court should simply endeavor to carry out the true intent of the parties, as expressed in words and interpreted by their conduct. In so far as relates to this case, the alleged inability of the receiver is entirely foreign to the question whether the agreement is in contravention of public policy. We hold that it is not, and that the only question of public policy involved in it is the wholesome public policy that requires parties to perform their contracts.

The next question relates to the alleged displacement of vested liens, as to which the court below uses this language:

"The sanctity of vested liens has always been recognized by the court in the administration of property. They are never displaced, except to preserve the property and keep it from destruction."

The right of the court to preserve the property has already been exercised in this case by its order allowing the issue of receiver's certificates, that have priority to the claims of the bondholders, for the repairs of the trestle on Pace's creek. The act of February 9, 1882 (17 St. at Large, S. C. p. 791), provides that judgments recovered against railroad corporations for personal injuries "shall take precedence and priority of payment of any mortgage, deed of trust or other security given to secure the payment of bonds made by said railroad company," provided actions are brought within the 12 months from the time the injury was sustained.

93 F.—36

The mortgage in this case, being subsequent to that act, is subject to its provisions. The court below uses this language:

"This is a contract between two common carriers,—one of these, the receiver, who owes a duty to the public to operate the road in his charge. This, perhaps, he could not do. At all events, he contracted with the other carrier, the South Carolina & Georgia Railroad Company, to perform this duty for him."

It will not be disputed that a court of equity, which puts property in the charge of its receiver for its preservation pending the litigation, will provide for the payment of all the necessary expenses incurred in the proper administration of the estate, before it orders distribution among creditors; and, if the receiver had operated this road himself, there can be little doubt that the court would have ordered the payment of all of these claims in priority to any claims of the bondholders. To what extent a receiver may incur obligations without the sanction of the court has not been precisely defined. That he may incur ordinary operating expenses is not disputed. This embraces all salaries of employés, ordinary supplies of material, and all expenses for keeping road and rolling stock in order; and the courts have held that claims for damage to either person or property are included in the general class of operating expenses. It is only when the receiver has undertaken to make contracts involving large expenditures, or for extraordinary purposes, or obligations extending beyond his term as receiver, that it has been necessary to obtain the sanction of the court. The case of Vanderbilt v. Railroad Co., 43 N. J. Eq. 669, 12 Atl. 188, may be referred to, to show how far the courts will go to compel performance on the part of the receiver in cases where contracts have been made without their express approval or ratification. In a well-considered opinion this language is used:

"If the contract has been completely performed, and its performance accepted by the receiver, and the claim is merely for compensation, relief of that nature would seem necessarily to be awarded, unless the applicant should appear to have dealt fraudulently or collusively with the receiver, to the detriment of the trust. Even if, in the judgment of the chancellor, the contract was improvident and unreasonable, unless the contractor should appear to have contracted with notice of the improper character of the contract, no just reason could be given for debarring him from the agreed-on compensation, which the receiver might, for his negligence or misconduct, be required to repay to the fund."

And in Vault Co. v. McNulta, 153 U. S. 563, 14 Sup. Ct. 918, the supreme court of the United States says:

"In respect to contracts which have been completely performed by a party dealing with a receiver, and when the claim is merely for compensation, equitable relief is often granted, although there was no previous approval or subsequent ratification of the receiver's act. This is pointed out by the chancellor in Vanderbilt v. Railroad Co., ubi supra."

"It may be laid down as a general proposition," says Mr. Justice Bradley in Cowdrey v. Railroad Co., "that all outlays made by the receiver in good faith, in the ordinary course, with a view to promote and advance the interests of the road, and to render it profitable and successful, are fairly within the line of discretion which is necessarily allowed to a receiver intrusted with the man-

agement and operation of a railroad in his hands. His duties, and the discretion with which he is invested, are very different from those of a passive receiver, appointed merely to collect and hold moneys due on prior transactions, or rents accruing from houses and lands. And to such outlays in ordinary course may be properly referred, not only the keeping of the road, buildings, and rolling stock in repair, but also the providing of such additional accommodations, stock, and instrumentalities as the necessities of the business may require; always referring to the court, or to the master appointed in that behalf, for advice and authority in any matter of importance, which may involve a considerable outlay of money in lump."

In Smith v. McCullough, 104 U. S. 25, referred to by the court below, the receiver had been authorized to borrow money upon receiver's certificates, to be expended in completing an unfinished portion of the road. He made a contract with the authorities of Sullivan county for municipal aid. It was this contract, which the court had never approved or ratified, that the supreme court held to be unauthorized.

The case is not before us in a shape which permits a final disposition of it. The motion to dismiss the petition was in the nature of a demurrer, and the statements in the petition, in that aspect, are to be taken as true. We are of opinion that, upon a fair construction of the agreement between the receiver and the appellant, the latter was operating the road as agent of the receiver, who was to receive all the possible benefits that would have followed from its personal operation by himself, with a saving of expense, and that inasmuch as appellant could derive no benefit therefrom, except that which followed indirectly as a feeder, the receiver should bear the direct burdens as if the same had been directly operated by him; that all the claims stated in the petition arose out of the operation of the road after it came into the hands of the receiver of the United States court; that that court was fully advised of the operating agreement; that it permitted its receiver to continue the arrangement which had been made first with the direct sanction of the judge of the state court; that, on the face of it, the agreement does not appear improvident; that, under the circumstances, it was probably the best arrangement that could be made; that with the experience of actual operation under it, for more than six months prior to the transfer of the road, the receiver, who could at any time have terminated it upon 15 days' notice, continued it, with the tacit acquiescence of all the parties and of the court. If, therefore, it should appear, upon the investigation which will be directed, that the appellant has fairly and in good faith performed the duties devolved upon it by the agreement, the same must be sustained as valid and binding. The learned counsel for appellee say that this construction leads to this result (using the language of their brief):

"It practically says: 'Take this road, run it as you please, be as reckless and extravagant in your expenditure as you are minded, conduct it as care-

lessly and negligently as you may choose; for the trust property will be made to refund you all amounts squandered, and shall indemnify you for, and keep you harmless from, all the damages resulting from your carelessness and negligence. Waste, ruin, imperil, and wreck, if you wish, for this contract will protect you from all.' "

It is scarcely to be conceived that such apprehension can be seriously entertained, but it may be as well to state briefly the principles that should govern the allowance of any claims made by the petitioner. If there is a deficit in operating expenses, and the petitioner shows that such deficit is not in any wise due to his fault or extravagance, and that he operated the road with care and diligence and economy, such deficit should be allowed. If there was any extravagance, recklessness, waste or betrayal, it should not be allowed. If the petitioner has been compelled to pay for damages to persons or property, and such damages are due to his recklessness or gross carelessness, he should not be reimbursed therefor; but if the damages are due to mere carelessness or negligence of the servants employed by him in the operation of the road, and he employed them without the knowledge that they were careless, exercising due care in their selection,—such care as he exercised in the selection of servants on his own road, provided the master shall find that his own road was managed with ordinary care,—then such damages fall within the class of operating expenses, and the petitioner is entitled to be reimbursed therefor. In other words, if the appellant can show that he operated the road of the receiver, while it was in his hands, with the same care, diligence, and economy that well-managed railroad companies ordinarily exercise in the operation of their own roads, he is entitled to stand in the place of the receiver, whose agent he was, and to be reimbursed for his losses and damages. The judgment of this court is that the decree below be reversed, and the case remanded, with directions to proceed in accordance with the principles herein announced. Reversed.